Okay, the next case on our docket is UnitedNet v. Tata. That's how I pronounce it, Your Honor, but you'd have to ask Appellate. Is it Tata? Tata. Tata, okay, good. Thank you. May it please the Court, my name is Scott Fuqua. I represent appellants in this matter. This is a matter arising, as you get the flavor from the briefing, from a failed business deal that had to do with the purchase of telecommunications assets at below market value in the hope that they would be able to be used and sold to earn a profit, a fairly straightforward business deal. What I believe the appeal fundamentally focuses on, what it really comes down to, is the application of New Mexico's place of the wrong rule. Appellants asserted five causes of action, each sounding in tort. There's a cause for breach of fiduciary duty, one for banning and abetting that breach of fiduciary duty. There's a cause for tortious interference. There's a general civil conspiracy complaint. There's also a claim for unjust enrichment. Now, for each one of those torts, and particularly for the first four, this question of whether this case belongs in the federal district court for the District of New Mexico or belongs in the U.K. turns on the application of that place of the wrong rule. Appellants have urged that the appropriate application of that rule is to hear the tort causes of action in the jurisdiction in which the last act necessary to give rise to liability on behalf of the actor asserted. So do you do that assessment based on the elements of the tort? The last act to create liability. I assume that that turns on the application of the elements. Not necessarily, Your Honor. It certainly could. And there are certainly cases where the issues presented in this case just don't present themselves at all, particularly in the tortious interference context, which I'll get to in just a moment. But sort of globally, what I'm hoping to address, first of all, is the application of the rule. Second, I'd like to address more specifically some of the questions surrounding the tortious interference claim. And third, a couple of the issues raised in the answer brief that are not properly before the court procedurally. But with the application of New Mexico's place of the wrong rule, it certainly can, in some cases, turn on the elements of the claim. I think that's really only important for the tortious interference claim. This is one of the points that I wanted to make. There's not a lot in the briefing, and I bear some fault for this, of course, myself having submitted two of the three briefs. But there's not much in the briefing addressing the claim for breach of fiduciary duty and aiding and abetting breach of fiduciary duty as it relates to the application of the place of the wrong rule. The briefing is mostly focused by both parties on the tortious interference claim. As it relates, though, to the first claim for breach of fiduciary duty, you don't have the same kind of baggage that you have on the tortious interference piece of it trying to determine what it is that constitutes tortious interference and whether or not the termination of the contract to which the party who's asserting the cause of action was a party is an element of the claim. I'll preview that by saying it isn't, and I'll talk in some more detail about that later. But as it relates to the breach of fiduciary duty claim, the only question is where did the breach occur? Where was the conduct that caused the breach of fiduciary duty or constituted the breach of fiduciary duty? And so you do that, I assume, by looking at the elements of what constitutes a breach of fiduciary duty, right? Sure. I may have misunderstood your question before, Your Honor. But yes, to determine whether or not a breach of fiduciary duty occurred, you, of course, have to know what it is that constitutes a breach of fiduciary duty. And you do that by looking at the elements. I don't know where else you would look. Yeah. And same for the tortious interference with contracts, right? There's one wrinkle in the tortious interference piece which has to do with whether or not the termination of the contract is itself an element of the cause of action. Okay. But you're like a chess player at the 10th move. Okay. I'm just a novice chess player. I'm just saying. So where do we look? My 15-year-old beats me every time in chess. To determine what the last act, the last event creating liability for tortious interference with contract, you at least, the board is the element. You've got to know what the claim is and the claim is defined by the element. Do you look at New Mexico tort law for elements or do you look at U.K. elements? New Mexico, Your Honor. Okay. And that is an issue also that is submitted on the briefs. I'm certainly happy to answer questions about that. But, yes, New Mexico is the appropriate because it's New Mexico's choice of law rules that are being applied by the district court in determining whether or not form non-convenience applies in the first instance. And that's an appropriate application. And there's no dispute about that. I don't read Appley's brief as disputing the application of New Mexico law. I mean, that's what their brief argues as well to the question of whether or not jurisdiction properly lies in New Mexico or whether this case needs to go to the U.K. And New Mexico looks to the restatement first of torts. Restatement first of conflict of law, restatement second of torts. And the restatement of second torts piece is only important in that tortious interference context. Well, actually, that's not true. It's important in the context of all of the claims. And that's actually the first thing that I wanted to address, which is this distinction that is drawn in New Mexico law between injury, which is the invasion of a cognizable legal interest, a protected legal interest on the one hand, and harm or damage, which is the economic consequence of the injury. New Mexico treats those two concepts distinctly. Appley's are trying very hard to conflate them because what they want is what they have said, is the injury was felt, the harm was felt in the U.K. That's where both of appellants are. Well, you didn't have a complete action under the elements of the claim until you had what happened in the U.K. I respectfully disagree, Your Honor. The reason that I do is because of this distinction. I interfere with your contract, or I try to interfere with your contract, but the party continues to honor the contract. I have a cause of action. Well, Your Honor, this is what the Carroll case addresses. Well, this is what you think the Carroll case addresses. Carroll is a statutory violation defined by ERISA. Correct. We don't have a statutory violation here. We have a tort claim. That's correct. But as Judge Bachrach has pointed out, it's defined by its elements, not by a statute. That's correct. In the elements of a tortious interference claim, this is one of the disputes between the parties, Appley's would have the court hold that you can only have a tortious interference claim if there are some damages flowing from the breach of contract. Isn't that exactly what Martin v. Franklin said the fourth element is for tortious interference with contract? Verbatim what you just said. In such a case in which the alleged interference was the breach of the contract, but there is law in New Mexico, and it is cited in the briefing, that addresses the case where a contract is interfered with not by convincing one of the contracting parties to breach the contract, but by interfering with the ability of one of the parties to the contract to do what they're supposed to do under the contract to enjoy the benefits coming to them as a result of their performance. So what is the stand-in element in that scenario for what you say is no longer the applicable fourth element? If I understand the question correctly, what you have to demonstrate for the kind of tortious interference claim that appellants have asserted here is that you had a valid contract, you had the reasonable expectation of the benefits of that contract, and that the party that you have sued has interfered with your ability to obtain those benefits. Let's say hypothetically that the TATA signatories say, well, you know, you, UnitedNet, have really shown us that other entities that did not sign this contract, unfortunately that we're ashamed to say are related to us, our affiliated enterprises have interfered with your ability to get a letter of credit or to have liquid assets of $10.7 million. So we're going to waive that. We are going to proceed with the contract. Do you still have a tortious interference with contract claim that has accrued? Well, under those circumstances, the impossibility of performance has been removed. So no. So that doesn't underscore that you have to show the damage. You have to show the contract was terminated. Your interference has to have been successful. You do have to show that the interference was successful, and here it was. The interference was not convincing the signatory. It was successful because they enforced the terms of the contract that you were unable to perform and terminated rather than being the very wonderful people that Judge Batrach is envisioning who waive all the conditions because you were treated unfairly. I think respectfully, Your Honor, that conflates exactly the two principles that New Mexico law treats separately. The success of the interference was not the termination of the contract. The success of the interference was making it impossible for appellants to perform under the contract. That's how the interference became successful. There were numerous roadblocks put in the way that made it impossible for appellants to do what they were supposed to do, at which point the Tata signatories to the contract were entirely privileged to terminate it because appellants hadn't done what they were supposed to do. The question is, why didn't appellants do what they were supposed to do? And the answer is because of the tortious interference of Appellese. And that is the interference that the tortious interference claim centers on. It doesn't require a breach of contract. There was no breach of contract by the Tata signatories. Like I said, they were perfectly privileged to terminate the contract. And it can't be the case that a third party, not a party to the contract, can interfere with the ability of one of the parties to the contract to perform, such that the inevitable result is the contract is terminated, they lose the contract's benefit, and say, yeah, but you didn't get tortious interference because nobody breached the contract. Isn't that exactly what happened in Santa Fe Technologies? In other words, if the federal government had canceled the bid and said, well, there's been shenanigans in the substitution of the bidding companies, we are going to cancel the bid, would there have been liability in Santa Fe Technologies? If the federal government had said cancel the bid, in that case, I think the answer is the same that I gave you earlier, no. Because in that case, the tortious interference didn't succeed in its goal. And so here, we don't know if the tortious interference succeeds until they cancel the contract, they terminate the contract for nonperformance. Again, Your Honor, and I apologize for struggling so mightily against this, but I think – Well, I'd struggle against it, too, because it sort of hinges on your informed nonconvenience. Well, it is the key distinction that identifies the dispute, the dispute between the parties at the core of the appeal, absolutely. The distinction is, Your Honor, the tortious interference occurred at the point that it was impossible for appellants to perform under the contract. That doesn't depend on the termination of the contract. But it wasn't actionable then. They had no economic harm. Again, this is the distinction between injury, the invasion of a cognizable – Well, injury is a legal injury, and you don't have a legal injury without harm in very limited circumstances like a trespass. Well, or some of the circumstances set out in the opinion by the Carroll Court are applicable, too. You have a surgeon – You have a violation of a statutory requirement in Carroll. I'm not talking about the violation in ERISA. I'm talking about the other examples identified by the court, such as, you know, you have a surgeon who leaves a sponge in. You don't know about that until later. You have somebody at will that gives the house to the wrong decedent – or, I'm sorry, the wrong heir. You find out about that, you know, after the fact. The injury is the leaving the sponge in. The economic harm is the result of either having it taken out or, you know, whatever it is that has to be done to remedy the problem. But you don't have an injury here until there are consequences from the interference. That, Your Honor, goes to the heart of the distinction. I mean, you don't have a situation here where, you know, by somehow they gave you bad information and it made you make a bad choice that they were statutorily required to give you full information. You know, you have a situation where, allegedly, they interfered with your performance and you didn't suffer any injury from that until you lost the contract. Your Honor, what I would say to that is that that use of the word injury is precisely the conflation that I contend appellees are guilty of. Injury is not the economic harm. Injury is the invasion of a cognizable legal right. And here, appellants had a cognizable legal right both to the expectancies under the contract and that they would be treated consistent with the fiduciary obligations that appellees bore to them. Neither one of those things happened. The harm, the economic harm, the damages, yes, flow from the termination of the contract. But the injury precedes those damages and is distinct from those damages. And that's what I think the Carroll case illustrates, not just in the ERISA context, but also in some of the common law contexts that the court discusses by way of example in Carroll. It's also in the restatement second of torts, right? It provides other examples such as trespass. You know, somebody steps onto another person's land. There's an injury. That's trespass. But if it's so transitory that it doesn't actually cause damage to the land, there may not be damages from it. It doesn't mean there wasn't trespass and it doesn't mean there wasn't an invasion on the legally cognizable right. The same thing could be, in fact, the example goes even further, say the trespass actually benefited the land in some way. It was still a trespass. And here there is still tortious interference with economic harm coming later. And that distinction is critical to determining the jurisdictional issue in this case. I'm out of time. At what point could they have filed this action if they didn't need the termination of the contract as the last act? I think they could have filed it as soon as they came to be aware that there had been a surreptitious action taken to prevent them from then being appellants. But if the contract hadn't been terminated, they could have continued to make an effort to. . . And they did. That's actually exactly what happened. They did continue to make an effort to. . . Right, which is why the contract's termination seems to be the last act. Well, the termination of the contract is the act that creates the economic harm. There's no doubt about that. There's no doubt about that. But for two reasons, one I've already discussed, the distinction between the invasion of the legally recognizable injury and the economic harm that results from that, and also because it puts us in sort of the odd position of liability on behalf of one actor turning not on their own conduct but on the consequential conduct taken by others, which in this particular case was conduct those parties were legally entitled to take because of the breach. But that's always the case with an interference of contract case. I mean, unless it's the other party to the contract, you're always going to have a situation where your cause of action depends on the activity of a third party coming in and interfering with your performance. And you can keep trying and trying and trying to perform until the other party to the contract says, I'm done. The contract's over. Typically, though, the circumstance under which that typically arises is where one party is inducing a breach. The non-party to the contract is inducing a breach by one of the other parties, saying, hey, look, I know you've got this deal over here, but I want you to do business with me instead, and taking the business away from the party who then asserts the tortious interference claim. Under those circumstances, the act that causes the injury and the act that caused the economic harm are the very same act. It is the drawing, the inducing of the breach of the contract. And that's just not the claim that's asserted here because the facts don't bear that out in this particular case. I apologize. I've gone a little over time. If you have questions, I'm happy to answer them. But I know you've got other business to get to. Okay, thank you very much. Thank you. May it please the Court, Doug Janicek representing Appalese Latin Group and Stephen Lucero. I will be arguing the forum non-convenes issue on behalf of all the Appalese. Counsel for Tata Sons and Tata India, Philip Robin, will address their personal jurisdiction defense. The district court was well within its discretion to send this case to where it belongs, the U.K. UnitedNet is located in the U.K. Its suit centers around a purchase contract UnitedNet entered into with overseas companies, one of which is also in the U.K. The contract is governed by U.K. law, and the assets that are the subject of the contract are in the U.K. and Netherlands. And the district court was right. Under New Mexico's choice of law rules, foreign law applies to the claims that UnitedNet brought. And to top it off, all defendants have consented to jurisdiction in the U.K. So this is not a question, as opposing counsel posed during his argument, where how can this not be tortious interference? How can you do these things and not have a claim? That's not the issue. There could be tortious interference, but the question is where does the case belong? He can bring his tortious interference claim, but he has to do it in the U.K., not in New Mexico. Let me ask you the same question I asked UnitedNet's counsel. You would determine the last event creating liability based on the elements, right? That is correct. New Mexico kind of also looks at the characterization of the claim. Is it a tort, which would be lex loci delicti? Is it like a contract, which is then where the contract is made? But you've endorsed the place of the wrong test. Yes. Right, and that's based on the last event creating liability, at least on the tortious interference with contract claim, right? That is correct, Your Honor, and also for all of the claims. Certainly the tort claims, breach of fiduciary duty, and tortious interference. I do want to correct, it is not an unjust enrichment claim. It is a quantum merit claim that is count five, and that makes a difference. Okay, let me, because I have a question about that, because if we're looking at unjust enrichment, he was enriched in New Mexico, right? So why are you making that? What is the difference in that distinction? Okay. First let me say with respect to the is there a different choice of law test. The plaintiff here has lumped all five together into the last act, giving rise to an injury. So we would submit that it's been waived, that there is even a separate test. But secondly, if you look at quantum merit in paragraph 122 of the complaint, and again it's titled quantum merit, not unjust enrichment, and the difference is the claim in there is Russell claims, quote, equitable entitlement to compensation for services performed. Well, Russell's in the U.K. The services he performed are in the U.K. So even if there is a separate choice of law test for quantum merit, and again we deem it waived, it would still fall to the U.K. And on top of that, it really is irrelevant to the extent that if all four of the tort claims are subject to form non-convenes, then the district court is well within its discretion to not split this case apart, keep one in New Mexico and the other four in the U.K. Instead, the district court said, I'm keeping this together and sending all five claims. Can I ask you, Allen, as far as the last event creating liability, how it would work with sort of an unusual type of tort claim that UnitedNet has? And let me ask you by virtue of sort of a fictional hypothetical question. Let's say I decide to open, thinking of a case we had this morning, a car dealership. And I call it Bob Bacarach Car Dealership. And I go to Bank Janicek. And I say, you know, I'd like to have a letter of credit financing for $20 million. And I have my competing car dealer. I'm a competitor with the Moritz Car Dealership. And she goes to the Janicek financing company and says, you know, that Bacarach Car Dealership, he's filed bankruptcy. He's done all sorts of bad things. He's got felony conviction. You know, the owner has felony convictions, et cetera, all of which are just terribly untrue. And I say, well, you know, we have a contract, you know, Janicek. And you say, well, that's right. We do have a letter of credit. You know, we have an agreement. We're going to abide by it. But on the other hand, I have started my contractual relationship with you on a pretty sour footing. And just like if UnitedNet had started, had not had the contract canceled and the Tata Signatories had said, well, we're going to go ahead with the contract. Well, you've already started without the financing that you had promised. Why doesn't that create liability? And I think this goes back to the New Mexico case, Santa Fe Technologies, where the court there said a wrong without damage does not amount to a cause of bankruptcy. Why don't they have damages even if the Tata Signatories hadn't canceled the contract? They're starting that huge undertaking with the, you know, the blemish that they started without the $10.7 million of liquid assets. But that's the nature of a tortious interference claim, which is what they brought. Had there been, hypothetically, a provision, for example, in that contract you're referring to, or in this one, for liquidated damages, let's say you have to meet a certain deadline for funding and you don't meet that and then those are assessed. And by your interference, those LDs are assessed. Well, that's a different case. There you actually have harm. We may not know the amount, but there is the fact of damage. You have to have the fact of damage. And so in your hypothetical, yes, possibly what he said could be defamatory. And then if you brought a defamation claim, you'd have to look at where did that wrong occur. But if you're looking at tortious interference, if it's ignored, if those attempts are ignored, think of it as a simple non-compete agreement, something everyone who's been an employee can appreciate. If a competitor calls a former employee and urges them to come to work for them, knows about the non-compete, says, don't worry about that non-compete. In fact, we'll give you a bonus, and if you can bring these files with you, we'll give you an added bonus. If the employee says no, there's no legal injury. What if they had, and I'm sorry to take up so much of your time, but what if UnitedNet had called the claim tortious interference with prospective business advantage? There's no longer an element that has to be termination of the contract. Just that you interfered with a prospective business relationship with the Tata Signatories or any other enterprise. Now would the last event that created liability have already taken place prior to the Tata Signatories' cancellation of the contract? Well, what's the fact of damage there, though? Again, I'm not... You interfered with their liquidity. Okay, that's possible. But even in this case, there's allegations of threatening to send them into bankruptcy, but it never happened. There could be allegations that could be made that certainly would say, okay, at this point, we have suffered an economic harm. We don't know the amount. We agree with it. It's not the amount, but we have suffered a harm. But that's not what this complaint alleges, and in fact, they never even sought leave to amend in the district court. They didn't seek it here in their opening brief, and so this is the complaint that we're stuck with. And I want to point out, to kind of sum up in terms of what their theory was, if you look at paragraph 13 of the complaint, it's clear where they say, this is the first sentence of the introduction of the whole background. They say, this litigation concerns a failed purchase by Plaintiff United of certain assets belonging to three Tata communication entities. That is what it was about. That's what this complaint was about. And so, therefore, that last act, that cancellation, is where, under the New Mexico choice of law rules, you would look, and that was in the U.K. Quickly, just on the balancing of the factors, under the Yavuz case, I believe, if I'm pronouncing that right, this court has made clear that there's substantial deference paid to the district court's balancing. Here, the district court went through each of the facts of this case, the witnesses spread abroad, the issues with the contract governed by U.K. law. Therefore, foreign law would have to be construed as part of this case, and the district court felt like the U.K. courts would be better equipped. I do want to leave, again, time for my colleague. I want to leave with one. There is an alternative ground here. I want to mention the forum selection clause. The only hiccup below was third-party beneficiary status. And we cited cases from the Ninth Circuit and the Seventh Circuit, Hubel and the Navi Ferro, that say third-party beneficiary status is a way to meet the closely related test. It's an example of it. But it's not a necessity. And this case is a perfect example of why you need flexibility in the closely related test. Well, the problem I see with that is that this particular contract has an express provision that says if you're not one of the two parties to this contract, you don't have any rights under this contract. Yes, except that is exactly what the Ninth and Seventh Circuit looked at and said, even if you're not a third-party beneficiary, you can still meet the closely related test. And especially here, where this is why the test was created in the federal courts, is because you have... Are you saying these circuits had a provision like we have here, and they said despite that provision, if you can, even though you're not a signatory, you're not a party, you can enforce the contract as a closely related party? They don't have those clauses. I understand your question. I don't believe they did. But, again, it was all that clause does is that's a standard clause. It just says there's no third-party beneficiaries. But that's not a requirement. And, again, the importance here is... It doesn't say there's no third-party beneficiaries. It says by name, if you're not party A or party B, you have no rights under this contract. Yes, Your Honor. But the closely related test, as applied by the circuits, has flexibility in it because of this situation where you have artful pleading where they don't bring a breach of contract claim, only bring torts, and don't sue the signatories. So you have a freely agreed upon form selection clause. UnitedNet agreed to that clause. They wanted litigation in the UK. But by artful pleading, they can avoid it. And that's why I think the federal courts follow the closely related test. I need to step aside for my co-counsel, unless there's any questions. Thank you, Your Honors. May it please the Court. Philip Robin on behalf of Tata Sons Private Limited and Tata Communications Limited, which in our briefs we referred to as Tata India to distinguish it from the other Tata Communications entities. Could you pull that a little closer to you? Sure. Just very, very quickly. You know, these Tata companies that are my clients, they have no presence in New Mexico at all. And I think that's undisputed. The way that the appellants try to get around that is through conspiracy jurisdiction. And they point to the Malaya case, which I think sets the standard in the Tenth Circuit. And under that case, you really need – that case is very clear. You can't have bare allegations of conspiracy. That's not enough. In other words, you need to have well-plaid allegations, which means non-conclusory, specific, you know, allegations that make a prima facie showing of conspiracy. And here, those are not the allegations that are in the complaint. The allegations are conclusory. There's group pleading. You know, there's references to Tata defendants, Tata Communications, even though there's lots of Tata Communications entities in the complaint. And that's just simply not enough to say, well, you can just group into this case these entities from Mumbai, India, and, you know, subject them to jurisdiction in New Mexico because they allegedly had dealings with someone named Lucero, who, you know, allegedly was a conspirator. And to just give you a sense of why the allegations are implausible and conclusory, I'll just go back to your example, Judge Bacharach. You had asked questions about, well, you know, what would happen if there was a waiver of the conditions and, you know, would there be a tortious interference? Well, if you look at the complaint, it's on appendix page 14 in paragraph 51. The allegation is that Tata Communications – and that's how it's identified. Tata Communications actually offered funding on reasonable terms at some point during this back and forth over the funding. Well, if Tata Communications offered funding on reasonable terms, well, what kind of a conspiracy is that? That's not a reasonable allegation of conspiracy. You can't have – you can't charge conspiracy, a plausible conspiracy, when one of the conspirators is allegedly offering terms that would undermine the entire conspiracy. I hate to do this to you, but you're 45 seconds over time, so you need to wrap that up. Okay. That's it. Thank you. Unless there's any questions. Thank you. Thanks very much. All right. I do want to mention to both sides, I thought your arguments today and your briefing were just excellent. And so I really appreciate the excellent advocacy. This matter is submitted.